IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 10, 2022 Session

## ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY ET AL. v. SEVIER COUNTY ELECTRIC SYSTEM ET AL.

**Appeal from the Circuit Court for Sevier County**
**Nos. 17-CV-797-III, 17-CV-799-IV, 17-CV-800-III, 17-CV-806-III, 18-CV-781-II**
**Rex H. Ogle, Judge**

_____

### No. E2021-00297-COA-R3-CV
_____

This appeal involves several consolidated lawsuits that were filed by insurance companies concerning a wildfire that occurred in Sevier County on November 28, 2016. The insurance companies alleged that the fire was sparked by dead or diseased trees falling on or striking electrical lines and that the fire quickly spread to neighboring properties, including properties owned by their insureds. The insurance companies urged that the defendant vegetation management contractor should be held liable for the losses for failing to prune or remove the diseased trees before they contacted the power lines. The trial court granted summary judgment in favor of the vegetation management contractor, determining, *inter alia*, that the contractor owed no duty to inspect or remove trees that were located outside the right of way that the contractor had agreed to maintain. The insurance companies have appealed. Discerning no reversible error, we affirm the trial court's grant of summary judgment to the vegetation management contractor.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Matthew J. Evans, Knoxville, Tennessee; Mark S. Grotefeld, Austin, Texas; Amy L. Dvorak, Emma L. Gaddipati, and Mark L. McGuire, Chicago, Illinois; Shawn E. Caine, Del Mar, California; and Craig S. Simon, Irvine, California, for the appellants, Allstate Property & Casualty Insurance Company; Allstate Vehicle & Property Insurance Company; Allstate Indemnity Company; Allstate Fire & Casualty Insurance Company; Allstate Insurance Company; Allstate County Mutual Insurance Company; Cincinnati Insurance Company; Cincinnati Specialty Underwriters Insurance Group; Farmers

Insurance Exchange; Foremost Insurance Company Grand Rapids, Michigan; Garrison Property and Casualty Company; General Insurance Company of America; Homesite Insurance Company of the Midwest; LM Insurance Corporation; Lexington Insurance Company, Liberty Mutual Fire Insurance Co.; Metropolitan Property & Casualty Company; Safeco Insurance Company of America; State Farm Fire & Casualty Company; State Farm Mutual Automobile Insurance Company; United National Insurance Company; United Services Automobile Association; USAA Casualty Insurance Company; and USAA General Indemnity Company.[1]

Jessalyn H. Zeigler, Sara Morgan, and Scott D. Gallisdorfer, Nashville, Tennessee, for the appellee, Wolf Tree Experts, Inc.

**OPINION**

I.  Factual and Procedural Background

The initial plaintiffs, Farmers Insurance Exchange, Foremost Insurance Company Grand Rapids Michigan, and United National Insurance Company, filed a complaint in the Sevier County Circuit Court ("trial court") on November 22, 2017, against the City of Sevierville ("the City"); Sevier County Electric System ("SCES"); and SCES's vegetation management ("VM") contractor, Wolf Tree, Inc. ("Wolf") (collectively, "Defendants").  The plaintiffs alleged, *inter alia*, that a wildfire broke out on November 28, 2016, near Little Cove Road in Sevierville, Tennessee, and quickly spread to adjacent properties, including properties owned by the plaintiffs' insureds, causing damage thereto and resulting in insurance claims being filed concerning such damage.  The plaintiffs further alleged that they had paid or would pay these claims, resulting in the plaintiffs having a right of subrogation such that they stood in the shoes of their policyholders and could seek payment from Defendants.

The plaintiffs averred that although Defendants had notice of a dangerous and defective condition concerning decaying and diseased trees located near electrical transmission and distribution lines, Defendants had failed to take action to prevent harm. The plaintiffs claimed that these trees had manifested visible signs of decay and that Defendants should have known that contact between these trees and energized power lines would result in electrical failure, fire, and property damage.  According to the plaintiffs, on November 28, 2016, two Scarlet Oak trees fell due to their diseased condition and contacted the power lines, causing electrical arcing and sparks that ignited nearby vegetation and resulted in a wildfire ("Little Cove Fire").

---

[1] We have adopted the list of plaintiffs/appellants provided in the appellants' brief on page 10, footnote 2, having determined such a list difficult to discern from the appellate record.

The plaintiffs also alleged that Defendants were negligent due to, *inter alia*, their failure to identify and remove the diseased trees, which created a foreseeable risk to the insureds' property. Moreover, the plaintiffs asserted that because Defendants' actions or inaction caused the Little Cove Fire, Defendants should be held liable for trespass inasmuch as the Little Cove Fire constituted an unauthorized entry upon the insureds' property. The plaintiffs further alleged that Defendants' actions/inaction had created a nuisance that interfered with the insureds' use and enjoyment of their property. With regard to Wolf specifically, the plaintiffs advanced that Wolf had a duty to conduct its vegetation management and hazardous tree abatement activities in a reasonable, competent, and workmanlike manner to prevent trees from contacting the electrical transmission lines and causing damage to their insureds' property. The plaintiffs therefore sought compensatory, consequential, and incidental damages as well as pre- and post-judgment interest and attorney's fees from Defendants.

Similar complaints were concomitantly filed in the trial court by other insurance companies, including Homesite Insurance Company of the Midwest, United Services Automobile Association, USAA Casualty Insurance Company, USAA General Indemnity Company, Garrison Property and Casualty Company, Allstate Property & Casualty Insurance Company, Allstate Vehicle & Property Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, Allstate Insurance Company, Allstate County Mutual Insurance Company, LM Insurance Corporation, Metropolitan Property & Casualty Company, State Farm Fire & Casualty Company, and State Farm Mutual Automobile Insurance Company (collectively, along with the initial plaintiffs, "Plaintiffs").

Defendants filed motions seeking to consolidate the actions, which motions were granted by the trial court. Plaintiffs subsequently filed a motion seeking to consolidate the actions involving the Little Cove Fire and to separately consolidate certain related actions filed in the trial court involving another fire that began around Red Fox Trail in Gatlinburg, Tennessee ("Cobbly Nob Fire").[2] Plaintiffs also sought to have the prior consolidation orders set aside. Defendants opposed Plaintiffs' motions to consolidate the Little Cove and Cobbly Nob cases separately and to set aside the previous consolidation orders.

Meanwhile, SCES and the City filed answers to the complaints denying liability and asserting various affirmative defenses, including governmental immunity. Wolf likewise filed answers to the complaints denying liability and asserting various affirmative defenses, including lack of duty and lack of proximate cause.

---

[2] According to the record, the Little Cove Fire involved trees located on SCES's "Wears Valley circuit" and the Cobbly Nob Fire involved trees located on SCES's "Jones Cove circuit."

The trial court entered an order on March 19, 2018, setting aside the earlier consolidation orders and consolidating all of the cases for purposes of discovery and pretrial motions only. The order provided in part that Judge James L. Gass would preside over pretrial motions and discovery issues in the consolidated actions and that any party could move for consolidation for trial purposes at a later date.

On April 2, 2018, the City filed a motion for summary judgment, arguing that the City was entitled to judgment as a matter of law based on the immunity provisions of the Governmental Tort Liability Act ("GTLA"). In support, the City filed the affidavit of Allen Robbins, superintendent of SCES. Mr. Robbins explained that the City did not own, control, or maintain any of the electric distribution lines. Rather, those lines were owned and controlled by SCES. Mr. Robbins further explained that SCES had contracted with Wolf to perform VM services and that the City did not perform such services and was not a party to the contract. The City filed a similar affidavit executed by Russell Treadway, City Manager for the City. The City also filed a statement of undisputed material facts. On May 18, 2018, Plaintiffs filed a notice of voluntary dismissal with respect to their claims against the City. An order of dismissal concerning Plaintiffs' claims against the City was entered on June 1, 2018.

On November 26, 2018, Safeco Insurance Company of America ("Safeco") filed a complaint against SCES and Wolf, containing substantially the same allegations as included in the earlier complaints. On December 31, 2018, Safeco filed a notice of voluntary nonsuit concerning its claims against SCES. The trial court entered an order dismissing Safeco's claims against SCES on January 4, 2019. On January 30, 2019, Wolf filed an answer to Safeco's complaint, denying liability.

On March 7, 2019, SCES filed a motion seeking to amend its answer pursuant to Tennessee Rule of Civil Procedure 15 by adding additional defenses. On April 22, 2019, Wolf filed a motion seeking to consolidate the complaint filed by Safeco with the other consolidated cases.

Wolf concomitantly filed a motion for summary judgment, arguing that Wolf was entitled to judgment as a matter of law concerning Plaintiffs' allegations of negligence because Wolf owed no duty to Plaintiffs to inspect or remove allegedly hazardous trees that existed outside the fifty-foot right of way that Wolf was contractually obligated to maintain. Wolf further argued that Plaintiffs could show no evidence of a negligent or intentional trespass or nuisance. In support, Wolf filed a statement of undisputed material facts along with an affidavit from one of Wolf's attorneys, attaching a copy of the contract between Wolf and SCES, a copy of SCES's "Right-of-Way Vegetation Management Requirements & Standards," portions of the National Electrical Safety Code, portions of certain fire and other codes, and various photographs. Wolf also attached the affidavit of Ryan Lynch, land surveyor and co-owner of Lynch Surveys, LLC, who stated that he had identified the trees in question and that they were

respectively located thirty-three and thirty-eight feet outside the boundaries of the right of way maintained by Wolf.

On April 26, 2019, the trial court entered an order allowing SCES to amend its answer to include additional defenses. On May 3, 2019, the trial court entered an order clarifying that dispositive motions would be heard by the judge assigned to the particular case in which the motion was filed. On May 7, 2019, an order was entered consolidating the Safeco matter with the other cases for purposes of discovery and pretrial motions.

Wolf and SCES (now collectively, "Defendants") subsequently filed a joint motion asking the trial court to reconsider its May 3, 2019 order such that dispositive motions could be filed in the consolidated action and heard by one judge, for reasons of judicial economy. Defendants insisted that unless the motions were consolidated, they would have to set nine summary judgment hearings before four different judges. Wolf asserted that its summary judgment motions, whether filed concerning the Cobbly Nob Fire or the Little Cove Fire, contained the same legal arguments. On May 30, 2019, the trial court entered an order consolidating the claims concerning the Cobbly Nob Fire into one action, to be heard by Judge Carter S. Moore, and consolidating the claims concerning the Little Cove Fire into a separate action, to be heard by Judge Rex Henry Ogle.

On January 24, 2020, certain plaintiffs filed a response to Wolf's motion for summary judgment, contending that Wolf had maintained a duty to remove or prune trees with the potential to affect electrical lines. In turn, they also posited that they had stated valid claims of trespass by fire and nuisance. These plaintiffs filed a response to Wolf's statement of undisputed material facts, delineating certain facts that were in dispute. They also filed an affidavit from one of their attorneys attaching various documents including copies of the ANSI A300 standards concerning trees; deposition transcripts; discovery responses; the affidavit of Michael Neal, a VM consultant; and an affidavit of Michael Mahoney, a consulting arborist. Other plaintiffs subsequently adopted this response. Wolf thereafter filed additional documents in support of its summary judgment motion, including a reply concerning standards applicable in Tennessee and a response to Plaintiffs' additional statements of undisputed material fact.

The trial court conducted a hearing relative to Wolf's summary judgment motion on February 4, 2020. On September 22, 2020, the trial court entered an order granting summary judgment in favor of Wolf. In its order, with regard to Plaintiffs' negligence claims based on a statutory duty, the trial court determined that although Tennessee had adopted the National Electric Safety Code ("NESC") by reference in Tennessee Code Annotated § 68-101-104(a)(2), "[t]he NESC does not place any duty upon [Wolf] with respect to its actions in removal of hazardous trees." The court therefore found that no statutory duty applied.

- 5 -

Respecting any duty based on contract, the trial court determined that the clear language of the contract required Wolf to abide by the specifications of the Sevier County Electric System Right-of-Way Vegetation Management Requirements and Standards, which only addressed what Wolf should do within the fifty-foot right of way. The court concluded that inasmuch as the trees in question were undisputedly located outside the right of way, Wolf had no duty to inspect or remove them pursuant to the contract. Furthermore, the court rejected Plaintiffs' arguments that a duty could be imposed on Wolf based upon the provisions of the ANSI A300 standards or the IVM Best Management Practices.

With regard to whether Tennessee common law imposed any additional duty in tort, the trial court found that it did not. The court determined that Wolf's actions did not amount to misfeasance or assumption of duty. Finally, the trial court concluded that Plaintiffs' claims of trespass and nuisance were also without merit.

On October 21, 2020, Plaintiffs filed a motion seeking permission for an interlocutory appeal and for a stay. In response, Wolf asked the trial court to defer ruling on this motion until a decision was rendered concerning Wolf's summary judgment motion filed in the companion Cobbly Nob Fire case.

On February 19, 2021, the trial court entered an order of final judgment, pursuant to Tennessee Rule of Civil Procedure 54.02, concerning Plaintiffs' claims against Wolf. The court determined that there was no just reason for delay and directed entry of a final judgment dismissing all claims against Wolf. The court stayed the claims pending against SCES until this appeal was concluded. The court also denied Plaintiffs' motion for an interlocutory appeal and Wolf's motion to defer as moot. Plaintiffs timely filed a notice of appeal on March 18, 2021.

## II. Issues Presented

Plaintiffs present the following issues for this Court's review, which we have restated slightly:

1.   Whether the trial court erred in its grant of summary judgment in Wolf's favor because Wolf owed Plaintiffs a duty to exercise reasonable care in the performance of utility tree and vegetation management services.

2.   Whether Tennessee common law's heightened duty of reasonable care for utilities in performing vegetation management surrounding power lines applies to contractors hired by utilities to perform vegetation management on the utility's behalf.

- 6 -

3. Whether Tennessee's public policy and the *Satterfield* factors support the imposition of a duty upon Wolf under the facts presented in this action.

4. Whether a vegetation management contractor who agrees to perform vegetation management services on behalf of a public utility has a duty to comply with state and/or local vegetation management regulations applicable to the work and if so, whether Wolf had a duty to comply with the NESC, as adopted by Tennessee Code Annotated § 68-101-104(a)(2).

5. Whether Wolf was required to comply with all state statutes and regulations, including the NESC and Tennessee Code Annotated § 68-101-104(a)(2), by reason of its contractual agreement to comply with Tree Line USA Guidelines, which included a requirement that Tree Line USA members must comply with all state and local rules applicable to vegetation management.

6. Whether Tennessee recognizes prevailing industry standards, such as ANSI A300 and IVM Best Management Practices, as evidence of a common law duty owed by utilities and their VM contractors performing vegetation management work.

7. Pursuant to the contract dated December 22, 2014, whether Wolf was required to inspect and/or identify hazardous trees which threatened the SCES power lines located along the Wears Valley circuit.

8. Whether the trial court erred in granting summary judgment because genuine issues of material fact existed concerning whether any portion of the trees in question were located inside of the right of way.

9. Whether the negligent inspection conduct complained of by Plaintiffs constitutes either misfeasance or nonfeasance under Tennessee law.

10. Whether an inspection for hazardous trees, which occurs jointly between a utility and a vegetation management contractor or independently by the contractor, is sufficient to establish a duty to do so reasonably under Tennessee's common law assumption of duty doctrine.

11.     Whether a genuine issue of material fact exists as to Plaintiffs' claim of negligent trespass.

12.     Whether a genuine issue of material fact exists as to Plaintiffs' claim of nuisance.

Wolf restates the issues as follows:

1.     Whether the trial court correctly held that Wolf had no duty to inspect, remove, or otherwise make safe any trees located outside of a contractual right of way, when (1) no statute imposes any such duty, (2) the relevant contract imposed no such duty, and (3) Tennessee common law imposes no such duty.

2.     Whether the trial court correctly held that Wolf did not voluntarily assume a duty to inspect, remove, or otherwise make safe any trees located outside of a contractual right of way where the relevant evidence and testimony demonstrated that Wolf did not actually undertake those acts and the utility did not rely on Wolf to do so.

3.     Whether the trial court correctly granted summary judgment in favor of Wolf concerning Plaintiffs' trespass claim when that claim necessarily relied on Wolf's alleged negligence, which Plaintiffs could not prove.

4.     Whether the trial court correctly granted summary judgment in favor of Wolf concerning Plaintiffs' nuisance claim when that claim necessarily relied on Wolf's alleged negligence, which Plaintiffs could not prove.

### III.  Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)).  As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied."  *Rye*, 477 S.W.3d at 250.  "Statutory construction is a question of law that is reviewable on a de novo basis without any presumption of correctness."  *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009).

As our Supreme Court has explained respecting the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

[W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. [574,] 586, 106 S. Ct. 1348, [89 L.Ed.2d 538 (1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

- 9 -

*Rye*, 477 S.W.3d at 264-65.  "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'"  *TWB Architects, Inc. v. The Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265).  Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order."  *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

### IV.  Propriety of Grant of Summary Judgment in favor of Wolf Concerning Claims of Negligence

The overarching issue presented by Plaintiffs questions whether the trial court properly granted summary judgment in Wolf's favor with respect to Plaintiffs' assertion that Wolf was negligent.  In answer to this query, the trial court determined that Wolf could not be held liable for negligence because Wolf owed no duty to inspect or remove the trees at issue.  Regarding a claim of negligence generally, our Supreme Court has elucidated that such a claim requires proof of the following elements:

> (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause.

*West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005).  The High Court went on to explain:

> [T]he concept of duty has become an essential element in all negligence claims.  The duty owed to the plaintiffs by the defendant is in all cases that of reasonable care under all of the circumstances.  Whether the defendant owed the plaintiffs a duty of care is a question of law to be determined by the court.

*Id*. (internal citations omitted).

Plaintiffs argue that a duty existed by virtue of Wolf's contract with SCES, common law, public policy, statute, and/or various regulations.  We will address each of Plaintiffs' arguments in turn.[3]

---

[3] Plaintiffs also raised an issue concerning whether "genuine issues of material fact existed concerning

## A. Wolf's Contractual Duties

Plaintiffs postulate that Wolf owed a duty to inspect for, prune, and/or remove trees that posed a hazard to electrical lines and conductors by reason of its contract with SCES. Our review necessarily focuses on the relevant contractual language. Wolf's contract with SCES ("the Contract"), dated December 22, 2014, provided in pertinent part:

> This contract is for tree trimming and other vegetation management for the SCES distribution circuit WV 103-224 containing approximately 43.11 miles of distribution power line. SCES agrees to contract [Wolf] . . . to perform tree and other vegetation trimming within proximity of SCES power lines and other equipment per provided specifications, requirements and mandates. SCES also agrees to contract [Wolf] for other utility forestry services as deemed necessary by SCES as specified in submitted contractor bid (UNIT PRICING BIDSHEET; TIME AND MATERIALS BIDSHEET) of said circuit.
>
> * * *
>
> [Wolf] shall faithfully uphold and observe all of the qualifications, requirements, stipulations and mandates contained within *Sevier County Electric System Right-of-Way Vegetation Management Requirements & Standards*.
>
> * * *

whether any portion of the trees in question were located inside of the right of way." However, because Plaintiffs failed to include argument concerning this issue in the argument section of their brief, we determine this issue to be waived. *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) ("An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7)."); *Banks v. Elks Club Pride of Tenn. 1102*, 301 S.W.3d 214, 227 (Tenn. 2010) ("[The appellant] has waived the issue regarding his entitlement to attorney's fees by failing to brief and argue the issue."); *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400-01 (Tenn. Ct. App. 2006) ("The failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue.").

Although Plaintiffs attempt to argue in their reply brief that other questions of fact exist precluding summary judgment, we cannot consider such arguments inasmuch as the arguments were advanced for the first time in a reply brief. *See Denver Area Meat Cutters & Emprs. Pension Plan v. Clayton*, 209 S.W.3d 584, 594 (Tenn. Ct. App. 2006) ("An appellant cannot abandon an argument advanced in his brief and advance a new argument to support an issue in the reply brief."); *see generally Shaw v. Gross*, No. W2017-00441-COA-R3-CV, 2018 WL 801536, at *4, n.5 (Tenn. Ct. App. Feb. 9, 2018).

[Wolf] hereby assumes entire responsibility and liability in and for any and all damages or injury of any kind or nature whatsoever to all persons, whether its employees or otherwise, and to all property, growing out of or resulting from the execution of the work provided for in this Contract or occurring in connection therewith. [Wolf] agrees to defend, indemnify and save harmless SCES and/or the City of Sevierville . . . from and against any and all losses and expenses, including court costs and attorney's fees, damages or injury growing out of or resulting from or occurring in connection with the execution of the work herein provided for; provided, however, that [Wolf] will not be held liable for loss of life or injury or damage to person or property due to the sole negligence of SCES, its agents, officers, servants or employees. This provision shall survive the termination or expiration of this Contract.

The document referenced in the Contract, "Sevier County Electric System Right-of-Way Vegetation Management Requirements & Standards" ("SCES Manual"), provides in relevant part:

1.1     Objectives

[SCES's] Vegetation Management (VM) program actively manages vegetation contained within rights-of-way that may come in contact with high voltage power lines and/or other infrastructure equipment to:

> A.     Ensure safety to people, pets and property;
> B.     Ensure reliable electricity to customers;
> C.     Maintain accessible power line rights-of-way;
> D.     Provide and/or enhance habitat for desirable vegetation and wildlife species.

1.2     Purpose

The purpose of these specifications is to provide direction for the proper pruning and management of trees, shrubs, vines and other vegetation which are in contact with, or have the potential to come in contact with power lines as located within rights-of-way, easements or pruning zones. All pruning of trees, shrubs, vines and other vegetation shall be in accordance with Tree Line USA requirements as described in:

> A.     "Pruning Trees Near Electrical Utility Lines: A Field Guide for Qualified Line-Clearance Workers" by Dr. Alex Shigo;

B. "Best Management Practices – Utility Pruning of Trees" by The International Society of Arboriculture;

C. ANSI A300 guidelines.

\* \* \*

2.2 Clearance Minimums: Transmission Lines, Distribution Lines, Secondaries, Street Lights and Service Drops

A. Transmission Lines: All pruning within transmission line rights-of-way will require close coordination between CONTRACTOR and SCES. Pruning of trees near transmission conductors may require the line to be de-energized. This will be coordinated between CONTRACTOR's Supervisor and SCES Project Representative. Clearance of transmission lines is both weather and load dependent and may not be available upon request. Clearances should be requested a minimum of forty-eight (48) hours in advance of work. All overhanging limbs shall be removed. All brush and trees less than seven (7) inches in diameter, excluding landscape-quality and ornamental trees located in maintained property owner's yards, shall be removed from the right-of-way and all brush chipped. All trees seven (7) inches and larger in diameter located in the right-of-way shall be removed only at the direction of SCES or SCES Project Representative and at the bid-submitted unit pricing. All side-pruning of trees shall be a minimum of twenty-five (25) feet from the energized conductor. See *Section II: Minimum Clearances-Transmission Lines (69kV)* in Appendix.

The transmission right-of-way shall be mechanically cleared (i.e. mowed) utilizing a bush-hog and/or a fecon to a minimum of twenty-five (25) feet from the centerline of the line or a total of fifty (50) feet unless otherwise noted on the map or drawing; or so directed by SCES or SCES Project Representative.

\* \* \*

Distribution Lines: All distribution line rights-of-way shall be cleared to a minimum of ten (10) feet from all energized conductors (including poles). Single-, two- and three-phase

- 13 -

distribution lines are not permitted through trees. All over-hanging limbs shall be removed. Leaving over-hanging limbs will only be considered in certain safe conditions, but in no case will a clearance of less than ten (10) feet be allowed. All diseased, weak and dead limbs above all conductors shall be removed. The final decision regarding leaving over-hanging limbs will rest solely with SCES or SCES Project Representative. See *Section I. Minimum Clearances-Primary Power Lines* in Appendix.

\* \* \*

B.  Secondary Conductors: Secondary conductors shall be pruned a minimum of ten (10) feet. The definition of a "Secondary Conductor" for tree pruning is as follows: *open three wire or triplex conductors that carry current from the secondary side of a distribution transformer to a lift pole or poles serving more than one customer.* Secondary conductors shall be pruned from the connection at the transformer to the last lift pole.

\* \* \*

D.  Service Drops: The definition of "Service Drop" is as follows: *secondary conductors, which carry current from the secondary side of a distribution transformer to a single customer connection or from the last lift pole serving more than one customer.* CONTRACTOR does not prune Service drops.

2.3  Tree Pruning

The following SCES Vegetation Management practices are in accordance with Tree Line USA requirements as described in "Best Management Practices-Utility Pruning of Trees" and/or "Pruning Trees Near Electric Utility Lines: A Field Guide for Qualified Line-Clearance Workers" by Alex Shigo and ANSI A300 tree pruning standards. CONTRACTOR shall provide Dr. Shigo's field guides to each crew who performs line clearance pruning. This guide will be available at each work site as a quick reference. Specifically, the following practices shall be followed:

\* \* \*

- 14 -

D.     All dead branches overhanging primary lines at any height shall be removed.

\* \* \*

K.     Special effort shall be made to eliminate all tree parts and growth points beneath the power lines, and all weak, diseased and dead limbs above the power lines, which may fall or blow into them.

\* \* \*

2.4    Tree, Brush and Vine Removal

A.     All trees less than seven (7) inches in diameter that will require pruning in future years shall be removed from the right-of-way, with the exception of low-growing trees (i.e. dogwoods, redbuds or ornamental trees) and landscape quality trees. . . .

B.     If CONTRACTOR is instructed by the property owner that he wishes to have any trees seven (7) inches and larger in diameter removed, CONTRACTOR shall inform SCES or SCES Project Representative of the request immediately. CONTRACTOR shall not remove trees seven (7) inches and larger in diameter until approval is received from SCES or SCES Project Representative. . . .

\* \* \*

D.     All hazardous trees (tall, dead, dying or leaning over primary power lines) located outside of the right-of-way and/or pruning zone shall be removed at the sole discretion of SCES or SCES Project Representative. . . .

\* \* \*

3.8    Evaluations and Completion

A.     SCES or SCES's Project Representative will evaluate CONTRACTOR performance for each circuit at the conclusion of the work based on components such as pruning

- 15 -

techniques, worksite cleanliness, quantity of work, quality of work, customer relations, responsiveness to problems and their resolution and effectiveness in completing work without rework. CONTRACTOR shall be provided with a copy of the evaluation report upon written request. CONTRACTOR performance evaluations shall be utilized concerning future vegetation management CONTRACTOR bids.

Based on Wolf's statement of undisputed facts and Plaintiffs' response thereto, the parties herein have agreed that the electrical lines "located near the location of the Little Cove Fire are transmission lines." As such, according to the Contract, Wolf was to clear the area "to a minimum of twenty-five (25) feet from the centerline of the line or a total of fifty (50) feet unless otherwise noted on the map or drawing; or so directed by SCES or SCES Project Representative." No proof has been presented that Wolf was directed to clear any areas beyond the twenty-five foot minimum on either side of the transmission lines, although Plaintiffs presented proof that Wolf did remove trees outside the right of way in certain instances when SCES directed or authorized Wolf to do so.

The primary question here, however, is whether Wolf maintained a <u>duty</u>, pursuant to the Contract, to inspect, remove, or recommend for removal any trees outside the twenty-five foot right of way on either side of the transmission lines. Although some dispute exists in this matter concerning the exact location of the two trees that Plaintiffs have identified as hazardous and as a potential cause of the Little Cove Fire, it is undisputed that the trunks of those trees were located more than twenty-five feet from the centerline of the transmission lines and were thus outside the minimum clearance for the right of way as specified in the Contract.

In their appellate brief, Plaintiffs rely on the Contract's language stating that all pruning of vegetation by Wolf "shall be in accordance with Tree Line USA requirements" as described in:

A. "Pruning Trees Near Electrical Utility Lines: A Field Guide for Qualified Line-Clearance Workers" by Dr. Alex Shigo;
B. "Best Management Practices – Utility Pruning of Trees" by The International Society of Arboriculture;
C. ANSI A300 guidelines.

Plaintiffs advance the argument that these "requirements," specifically the ANSI A300 guidelines and the "Best Management Practices" published by the International Society of Arboriculture, obligated Wolf to inspect trees outside the right of way that had the potential to affect the utility lines. Plaintiffs specifically assert that the above-referenced guidelines required Wolf to perform a visual inspection of any trees outside the right of way that could possibly fall on or strike the transmission lines in order to check for

obvious defects and that Wolf should have reported the location of such trees to SCES so that SCES could make a decision about their removal. Plaintiffs cite various portions of the ANSI A300 guidelines, specifically Parts 7 and 9, as supportive of their arguments.

By way of example, Plaintiffs particularly cite Part 7, section 75.2, which provides:

> Trees and tree branches with the potential to affect utility facilities should be monitored for risk, and pruned or removed as appropriate (refer to ANSI A300 Part 9 – Tree Risk Assessment). Monitoring intervals, action thresholds and methods for mitigation shall be determined by the type of facility, regulatory requirements, and available resources.

ANSI A300, Part 9, concerns tree risk assessment and discusses the various levels of assessment that should be performed, how any risks detected should be analyzed, and how those risks should be reported. Section 93.6.4.1 clearly states: "It shall be the responsibility of the owner, the owner's agent, or the controlling authority to schedule repeat or advanced assessments, determine actions, and implement follow-up recommendations, monitoring, and/or mitigation." However, Plaintiffs contend that Part 9 generally supports their position that Wolf had a duty to inspect for hazardous trees.[4]

The core of the issue presented here is one of contract interpretation. As our Supreme Court has instructed:

> We review issues of contractual interpretation de novo. We are guided by well-settled principles and general rules of construction. "A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand* [*v. Pavletic*], 292 S.W.3d [618,] 630 [(Tenn. 2009)] (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)). We initially determine the parties' intent by examining the plain and ordinary meaning of the written words that are "contained within the four corners of the contract." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citing *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011)). The literal meaning of the contract language controls if the language is clear and unambiguous. *Allmand*, 292 S.W.3d at 630. However, if the terms are ambiguous in that they are "susceptible to more than one reasonable interpretation," *Watson*, 195 S.W.3d at 611, we must apply other

---

[4] Other portions of the ANSI A300 guidelines simply address proper tree pruning techniques, such as how and where tree limbs should be cut in order to "prevent the loss of [utility] service, comply with mandated clearance laws, prevent damage to equipment, maintain access, and uphold the intended usage of the facility/utility space while adhering to accepted tree care performance standards." Similarly, Dr. Shigo's "Field Guide" contains detailed drawings and instructions for the proper pruning of trees.

established rules of construction to aid in determining the contracting parties' intent. The meaning of the contract becomes a question of fact only if an ambiguity remains after we have applied the appropriate rules of construction.

*Dick Broad.*, 395 S.W.3d at 659 (other internal citations omitted). Of course, when "an executed agreement refers to other documents and makes the conditions of the other documents part of the executed agreement, they will be interpreted together as the agreement of the parties." *Burns v. Temperature Control Co.*, 371 S.W.2d 804, 806 (Tenn. Ct. App. 1962).

The instant Contract provided in pertinent part that Wolf was "to perform tree and other vegetation trimming within proximity of SCES power lines and other equipment per provided specifications, requirements and mandates" and to provide "other utility forestry services as deemed necessary by SCES[.]" Attendant thereto, Wolf agreed to "faithfully uphold and observe all of the qualifications, requirements, stipulations and mandates contained within" the SCES Manual.

Interpreting the Contract and the SCES Manual together, *see Burns*, 371 S.W.2d at 806, and determining the parties' intent by examining the plain and ordinary meaning of the written words utilized therein, *see Dick Broad.*, 395 S.W.3d at 659, it is clear that the SCES Manual established the parameters and scope of the tree and vegetation trimming and other forestry services that Wolf was to provide. The SCES Manual provided that SCES's vegetation management program was designed to "actively manage[] vegetation <u>contained within rights-of-way</u> that may come in contact with high voltage power lines and/or other infrastructure equipment" (emphasis added). According to the SCES Manual, Wolf was to clear a minimum of twenty-five feet on either side of the transmission lines and would remove all trees within such right of way that were less than seven inches in diameter. The SCES Manual further provided that trees seven inches in diameter and larger would be removed at the property owner's request and with SCES approval. Significantly, the SCES Manual provided that "hazardous trees," defined as "tall, dead, dying or leaning over primary power lines," which were located outside the right of way "shall be removed at the sole discretion of SCES or SCES Project Representative."

Upon our thorough review, we note that neither the Contract nor the SCES Manual articulates any requirement that Wolf <u>inspect</u> trees outside the right of way to determine whether they are hazardous or should be removed. Indeed, these documents do not impose a duty upon Wolf to remove or seek approval to remove such trees, either. Instead, any question concerning removal of trees located outside the right of way, like the trees at issue here, is addressed to SCES's sole discretion.

We note that Plaintiffs do not exclusively focus on the language contained within the four corners of the Contract or the SCES Manual as creating a duty that Wolf would inspect trees outside the right of way and recommend their removal; rather, Plaintiffs also rely on provisions contained within the additional documents referred to in the SCES Manual as "requirements" for proper tree "pruning" and argue that these additional documents imposed a duty upon Wolf that the Contract and SCES Manual may not have. The provision in the SCES Manual upon which Plaintiffs rely, however, states that its purpose is to "provide direction for the proper pruning and management of trees, shrubs, vines and other vegetation which are in contact with, or have the potential to come in contact with power lines as located within rights-of-way, easements or pruning zones" and that "pruning of trees, shrubs, vines and other vegetation shall be in accordance with Tree Line USA requirements as described in" the ANSI A300 guidelines and the accompanying "Best Management Practices" published by the International Society of Arboriculture, as well as Dr. Shigo's "Field Guide" (emphasis added).

As our Supreme Court has elucidated:

> We first recognize the foundational principles in all of Tennessee contract law. The common thread in all Tennessee contract cases—the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles.
>
> Also foundational to our jurisprudence is the principle that the rules used for contract interpretation "have for their sole object 'to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made.'" *McNairy v. Thompson*, 33 Tenn. 141, 149 (1853) (quoting Chitty on Con. 73).

*Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019) (other internal citations omitted). To that end, "the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (quoting 17 Am.Jur.2d, Contracts, § 245).

Upon careful review, we determine the language of the Contract and the incorporated SCES Manual to be clear and unambiguous.[5] Wolf's contractual duty was

---

[5] Because the Contract and incorporated SCES Manual contain no ambiguity, we need not resort to the use of parol evidence for interpretation, as Plaintiffs urge. *See*, *e.g.*, *Allstate Ins. Co. v. Watson*, 195

to clear a minimum of twenty-five feet on either side of the transmission lines and remove all trees within such right of way measuring less than seven inches in diameter. Decisions regarding removal of trees seven inches in diameter or larger or trees located outside the twenty-five foot right of way were left to the sole discretion of SCES. No contractual duty of inspection was imposed upon Wolf for trees located outside the twenty-five foot right of way.

According to the Contract and the SCES Manual, as concerning the proper methods for "pruning" of trees and other vegetation, the guidelines presented in the additional listed publications were to be followed. However, inasmuch as the Contract and SCES Manual placed no duty upon Wolf to inspect trees outside the right of way, much less to remove them unless directed to do so by SCES, such a duty could not be added by reference to additional guidelines concerning only proper "pruning" methods. As the trial court stated, "the contract between Wolf Tree and SCES imposed the duties and the ANSI A300 provided instructions on how to carry out the duties appropriately, in terms of making the appropriate cuts in the appropriate places." By referring to these additional guidelines in terms of proper pruning only, SCES clearly limited application of those documents to pruning methods rather than to all subjects covered therein.

In short, the plain and ordinary meaning of the clear and unambiguous written words "contained within the four corners of the contract," *see 84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011), provided that the additional guidelines referenced were to be applied to methods of pruning only. These additional documents did not add to or vary the terms of the contractual duties to which Wolf had agreed. Therefore, because the language of the Contract imposed no duty upon Wolf to inspect for hazardous trees located outside the right of way, the trial court properly granted summary judgment to Wolf on that basis.

### B. Statutory Duty

Plaintiffs additionally posit that Wolf has a statutory duty relative to its vegetation management work because Tennessee has adopted the NESC as applicable to maintenance and operation of Tennessee electrical lines, *see* Tenn. Code Ann. § 68-101-104, and the NESC provides that hazardous trees posing a danger to utility facilities should be pruned or removed. Tennessee Code Annotated § 68-101-104 (2013), found within "Miscellaneous Safety and Environmental Regulations" in Title 68 of the Tennessee Code, provides in relevant part:

> (a)    The American National Standard Electrical Safety Code, edition dated August 1, 2011, prepared and published by the Institute of Electrical and Electronics Engineers, Inc., 345 East 47th Street, New

York, New York, 10017, is adopted by the general assembly for application for all processes within the state of Tennessee as the official electrical safety code, to provide a standard for safeguarding of persons from hazards arising from the installation, operation, or maintenance of:

(1)     Conductors and equipment in electric-supply stations; and

(2)     Overhead and underground electric-supply and communication lines, and work rules for the construction, maintenance, and operation of electric-supply and communication lines and equipment, and the provisions of such National Electrical Safety Code are adopted herein by reference and shall not be copied in the codified sections or provisions of the Tennessee Code.

In support of their argument that the NESC imposes a statutory duty upon Wolf, Plaintiffs rely particularly on Section 218 of the NESC, which states: "Vegetation that may damage ungrounded supply conductors should be pruned or removed. Vegetation management should be performed as experience has shown to be necessary." Notwithstanding, as Wolf points out, a note to Section 218 provides that "right-of-way limitations" should be considered as one of the "[f]actors . . . in determining the extent of vegetation management required." Another such factor is the "vegetation's location in relation to the conductors." As a second note to Section 218 provides: "It is not practical to prevent all tree-conductor contacts on overhead lines."

The trial court determined that the above-referenced NESC provision "imposes no explicit duty on vegetation management contractors," further explaining that although the NESC "may state a standard for utility companies, it does not explicitly impose a duty on contractors." Our consideration of the NESC provisions contained in the appellate record leads to the conclusion that it is designed to serve as a "standard (or basis of the standard) of safe practice for public and private utilities in the United States," as stated in its introduction (emphasis added). Accordingly, any duty to prune or remove vegetation that could impact electrical supply lines would lie first and foremost with SCES. However, as Plaintiffs note, some authority exists supporting the position that utilities can delegate certain duties respecting the "maintenance" of utility systems to independent contractors. *See*, *e.g.*, *Dempsey v. Correct Mfg. Corp.*, 755 S.W.2d 798, 806 (Tenn. Ct. App. 1988) (explaining that "maintenance or alteration of . . . objects in proximity to the system which are not directly involved in the carrying of electrical energy is a matter which may be committed to independent contractors" while also explaining generally that "tree-cutting" is not included in "maintaining" utilities as used in the NESC and other regulations). As such, whether or not the NESC was intended to apply to contractors

employed by utilities, it appears that utilities can delegate certain duties thereunder to independent contractors under appropriate circumstances. *See id.*

Assuming, *arguendo*, that SCES could properly delegate its duty, pursuant to the NESC, to Wolf for pruning or removal of vegetation that might damage ungrounded supply conductors, any question relative to the parameters and scope of the duty delegated to Wolf would be controlled by the parties' Contract. *See, e.g., Frazee v. Med Ctr. Inns of Am., Inc.*, No. 01A01-9301-CV-00034, 1993 WL 312674, at *4 (Tenn. Ct. App. Aug. 18, 1993) (explaining that when a party delegates a duty to another, the respective duties of each are delineated by their contractual agreement). We reiterate that the Contract only required Wolf to remove trees located within the right of way and measuring less than seven inches in diameter without SCES's authorization and/or direction. The trees at issue here were undisputedly located outside the right of way. Therefore, SCES maintained sole discretion as to their removal. Ergo, Plaintiffs' assertion that Wolf owed a statutory duty to remove the trees at issue pursuant to the NESC must fail for similar reasons that were fatal to Plaintiffs' position that Wolf owed a duty pursuant to the parties' contract. We accordingly conclude that Wolf owed no statutory duty to remove the trees at issue based on Tennessee Code Annotated § 68-101-104 or the NESC, and we affirm the trial court's grant of summary judgment as to this issue.[6]

## C. Assumption of Common Law Duty

Plaintiffs contend that because Wolf, on occasion, performed visual inspections of trees existing both inside and outside the right of way while it performed vegetation pruning and removal under the Contract, Wolf voluntarily assumed a duty to perform such inspections outside the right of way defined in the Contract and to identify hazardous trees for pruning or removal. Plaintiffs rely on the common law statement of a general principle found in *Biscan v. Brown*, 160 S.W.3d 462, 482-83 (Tenn. 2005), that: "One who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully" (quoting *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. 2000)). As the trial court noted, this principle applies in situations where "a party has undertaken to provide services to another" and where a third party "suffer[s] physical harm from the negligent performance of the undertaking." *See Grogan v. Uggla*, 535 S.W.3d 864, 873 (Tenn. 2017).

---

[6] Plaintiffs also argue that the affidavit of their vegetation management expert, Michael Neal, opining that "[Wolf's] failure to adequately prune or remove the subject tree suffering from obvious structural defects was a violation of the NESC statutory standard of care" was sufficient to establish a statutory duty. We note, however, this Court's previous instruction that "content meaning and application of statutes and regulations are not a matter of fact to be proven by the affidavit of an expert witness, but are a matter of law." *Dempsey*, 755 S.W.2d at 806.

In further defining this principle, Tennessee courts have often cited with approval Section 324A of the Restatement (Second) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a)     his failure to exercise reasonable care increases the risk of such harm, or
>
> (b)     he has undertaken to perform a duty owed by the other to the third person, or
>
> (c)     the harm is suffered because of reliance of the other or the third person upon the undertaking.

*See Grogan*, 535 S.W.3d at 874. The question of whether a party has assumed such a duty is a question of law. *See id.*; *see also Biscan*, 160 S.W.3d at 483.

Plaintiffs contend that Wolf should be deemed to have assumed a common law duty to inspect for hazardous trees located beyond the right of way specified in the Contract because each of the party witnesses who testified via deposition in this matter affirmed that Wolf performed hazardous tree inspections outside the right of way. Respectfully, our review of the deposition testimony presented demonstrates that Plaintiffs' argument is unpersuasive. For example, Jeff Hedrick, the corporate representative for SCES, testified that trees were "typically" marked for removal by SCES inspectors. Mr. Hedrick clarified that although the VM contractor could "point a tree out," the SCES inspector "will have the discretion whether to cut that tree or not." During this questioning, Mr. Hedrick made no distinction concerning whether he was referring to trees located inside or outside the right of way.

Jared Underwood, a utility forester for SCES assigned to the circuit in question, testified that he was present on the Wears Valley circuit daily while Wolf employees were working. He also testified that he had inspected the circuit before Wolf began work. Mr. Underwood expressly stated that it was his responsibility to identify trees for removal and that he would "go ahead" of Wolf employees to mark trees that needed to be removed. Mr. Underwood also related that although Wolf's employees sometimes pointed out a tree or requested that he look at a tree, the responsibility to identify trees for removal was SCES's. Mr. Underwood made no distinction in this testimony concerning whether he was referring to trees located inside or outside the right of way.

- 23 -

Nathan Dunn, a vegetation inspector for SCES who worked on the separate Jones Cove circuit, similarly testified that although Wolf employees at times asked him to look at a particular tree or conferred with him about a tree, it was ultimately SCES's responsibility to identify trees for removal. Steven Springer, the supervisor of vegetation management for SCES, testified that SCES employees were tasked with identifying hazardous trees and had the final say on whether trees seven inches in diameter or larger were removed. Mr. Springer added that although VM contractors were not required to notify SCES regarding trees that needed to be removed outside the right of way, they did so at times. However, Mr. Springer clarified that removal of trees outside the right of way was SCES's "call."

Daniel Allen, a former employee of Wolf who served as a supervisor for the Wears Valley circuit during the relevant time frame, testified that while he sometimes pointed out trees to the SCES inspector that he felt needed to be removed within the right of way, he would only mention a tree outside the right of way if it was "noticeable." David Jackson, the operations manager for Wolf during the applicable time frame, testified that he inspected the circuit before Wolf bid on the job and helped calculate the cost of the work for bidding purposes. Notably, Mr. Jackson did not state that he had inspected any trees located outside the right of way or that he had marked any such trees for potential removal.

In considering the above-referenced testimony in light of Plaintiffs' claim of voluntary assumption of a common law duty, we find the Supreme Court's opinion in *Grogan* to be instructive. *See* 535 S.W.3d at 873-876. In *Grogan*, the High Court was asked to determine whether a residential home inspector, who had performed an inspection of a home for a potential home buyer, could subsequently be held liable for the injuries of a third party who fell from the home's deck because the deck railing, which was alleged to be improperly built, collapsed. *Id*. at 866. The injured party filed suit against the home inspector and claimed, *inter alia*, that the inspector had performed a negligent home inspection. *Id*.

The *Grogan* Court, in analyzing the negligence issue, considered whether Section 324A should apply and whether the inspector had undertaken a duty for the protection of the injured third party. *Id*. at 874. In determining whether the inspector had actually undertaken such a duty, the Court reviewed the inspector's contract with the home owner for a home inspection, deposition testimony, and the "relevant statutes and regulations." *Id*. at 874-75. Specifically, the plaintiff had alleged that the inspector failed to find that the deck railing was non-compliant relative to the applicable building code, but the home inspection contract stated that the inspection was "visual only and not a building code inspection," and the inspector testified that he was not a building codes inspector. *Id*. at 875. Furthermore, the contract stated that "[n]ot all conditions may be apparent" and that the inspector was not liable for "patent or latent defects in materials, workmanship, or other conditions." *Id*. Based primarily on limitations stated in the inspection contract

- 24 -

and the inspector's testimony, the Court determined that the inspector had not voluntarily assumed any duty beyond that which he owed to his client pursuant to their agreement. *Id*. at 876.

Similarly, here, the Contract and incorporated SCES Manual expressly provide that SCES has sole discretion concerning the removal of trees located outside the right of way, and no duty to inspect for hazardous trees outside the right of way is imposed upon Wolf. The deposition testimony unequivocally established that trees located outside the right of way were only removed with SCES's express authorization. Moreover, although there existed some testimony that Wolf employees occasionally pointed out trees that they believed should be removed, the duty to inspect for such trees outside the right of way belonged to SCES. Mr. Underwood, who worked daily on the Wears Valley circuit, testified that he proceeded ahead of Wolf's employees to mark trees for removal and that identification of such trees was SCES's responsibility. Mr. Allen, also present daily on that circuit, testified that he only mentioned a tree for removal authorization outside the right of way if it was "noticeable." Based on the facts presented concerning Wolf's agreement with SCES and the respective deposition testimony, we conclude that the trial court correctly determined that Wolf did not voluntarily assume a common law duty to inspect for hazardous trees located outside the right of way.

### D. Imposition of Common Law Duty and Misfeasance/Nonfeasance

Plaintiffs also rely on a "common law duty" with respect to their negligence claim against Wolf. Tennessee common law recognizes that duty consists of a "legal obligation to conform to a reasonable person standard of care in order to protect others against unreasonable risks of harm." *Satterfield v. Breeding Insulation Co*., 266 S.W.3d 347, 355 (Tenn. 2008). As our Supreme Court explained:

> As a general rule, persons have a duty to others to refrain from engaging in affirmative acts that a reasonable person "should recognize as involving an unreasonable risk of causing an invasion of an interest of another" or acts "which involve[] an unreasonable risk of harm to another." Restatement (Second) of Torts §§ 284, 302, at 19, 82 (1965). Thus, if an individual "acts at all, [he or she] must exercise reasonable care to make his [or her] acts safe for others." Restatement (Second) of Torts § 4 cmt. b, at 8. The core of negligence is the violation of this requirement by engaging in "behavior which should be recognized as involving unreasonable danger to others." W. Page Keeton, Prosser and Keeton on the Law of Torts § 31, at 169 (5th ed.1984) [hereinafter "*Prosser and Keeton*"].
>
> These rules do not, however, require that persons always act reasonably to secure the safety of others. Rather, they serve a more limited role as restraints upon a person's actions that create unreasonable and

foreseeable risks of harm to others. Expounding upon this point more than a century ago, Professor Francis H. Bohlen asserted that "[t]here is no distinction more deeply rooted in the common law and more fundamental than that between misfeasance and non-feasance, between active misconduct working positive injury to others and passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant."

*Id*. at 355-56 (quoting Francis H. Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability*, 56 U. PA. L. REV. 217, 219 (1908)).

The *Satterfield* Court further elucidated:

Professor Bohlen is not the only scholar to offer an eloquent and enlightening articulation of the distinction between misfeasance and nonfeasance. Dean Keeton and Dean Prosser explained the distinction as follows:

In the determination of the existence of a duty, there runs through much of the law a distinction between action and inaction. . . . [T]here arose very early a difference, still deeply rooted in the law of negligence, between "misfeasance" and "nonfeasance"—that is to say, between active misconduct working positive injury to others and passive inaction or a failure to take steps to protect them from harm. The reason for the distinction may be said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs.

*Prosser and Keeton* § 56, at 373.

*Id*. at 356 (footnote omitted).

Plaintiffs advance that Wolf's alleged failure to properly inspect for or remove the hazardous trees at issue constitutes misfeasance rather than nonfeasance. Plaintiffs predicate their assertion of misfeasance in part on their position that Wolf owed a heightened duty of care to the public pursuant to Tennessee common law "commensurate with the extreme danger posed by the electrical power lines."

In support of their postulate, Plaintiffs rely on this Court's opinions in *Rogers v. City of Chattanooga*, 281 S.W.2d 504, 508 (Tenn. Ct. App. 1954) ("[T]he City was

required not only to install or erect the uninsulated high-tension wires, which carried death for anyone who came in contact with them, at a safe height above the ground, but . . . was also under a duty to patrol and inspect said lines at frequent intervals to see that the lines did not later become unsafe and dangerous by changing conditions, such as, overhanging tree branches, erection of buildings, etc."); *Int'l Harvester Co. v. Sartain*, 222 S.W.2d 854, 867 (Tenn. Ct. App. 1948) ("One who deals with an article which is imminently dangerous owes a public duty to all to whom it may come and who may be endangered thereby to exercise caution adequate to the peril involved[.]"); and *Rollins v. Elec. Power Bd. of Metro. Gov't of Nashville & Davidson Cnty.*, No. M2003-00865-COA-R3-CV, 2004 WL 1268431, at *6 (Tenn. Ct. App. June 8, 2004) ("It is the supplier of electricity who is charged with the heightened duties for public safety[.]"). The obvious distinction between the case at bar and *Rogers*, *Sartain*, and *Rollins*, however, is that in those cases, the "heightened" duty being analyzed belonged to the owner or operator of the electrical lines, not a private contractor hired to manage vegetation. As the trial court observed, "[Wolf] is not a utility and [Wolf] was not in control of electricity or the electrical lines in any way[.]" As such, the cases from this Court relied upon by Plaintiffs for imposition of a heightened duty are unavailing.

Plaintiffs also cite a decision from the California Court of Appeals, *CHY Co. v. Util. Tree Servs., Inc.*, No. C054697, 2008 WL 4838684, at *2 (Cal. Ct. App. Nov. 10, 2008), as authority for the contention that a VM contractor's improper performance of tree inspections constitutes misfeasance rather than nonfeasance. Plaintiffs' reliance is again misplaced for at least two reasons. First, the vegetation management contractor in *CHY* had a contractual duty to inspect for hazardous trees, whereas Wolf did not. *See id*. Second, although "cases from other jurisdictions are sometimes persuasive in this Court, they do not operate as controlling authority." *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800, 817 n.12 (Tenn. Ct. App. 2015). We therefore determine *CHY* to be unavailing as well.

Plaintiffs also place special emphasis on the factors listed in *Satterfield* concerning utilization of a balancing test for foreseeability and gravity of harm in determining a defendant's duty. We emphasize, however, that in instances where the defendant has made the plaintiff's situation no worse (nonfeasance), there is generally no duty to act. *See Satterfield*, 266 S.W.3d at 356. Exceptions to this rule exist for certain special relationships between the parties, none of which are applicable to the parties herein. *Id*. at 359. The *Satterfield* balancing test and its applicability in situations concerning misfeasance versus nonfeasance was succinctly explained by this Court in *Koczera v. Steele*, 570 S.W.3d 242, 247-49 (Tenn. Ct. App. 2018):

> "As a general rule, persons have a duty to others to refrain from engaging in affirmative acts that a reasonable person 'should recognize as involving an unreasonable risk of causing an invasion of an interest of another' or acts 'which involve[] an unreasonable risk of harm to another.'"

*Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008) (quoting Restatement (Second) of Torts §§ 284, 302, at 19, 82 (1965)). Such affirmative acts are known as "misfeasance." *Giggers* [*v. Memphis Hous. Auth.*], 277 S.W.3d [359,] 364 [(Tenn. 2009)].

Conversely, "nonfeasance" is "passive inaction or a failure to take steps to protect [others] from harm." *Satterfield*, 266 S.W.3d at 356 (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 56 (5th ed. 1984)).

> As for nonfeasance, Tennessee's courts generally have declined to impose a duty to act or to rescue. *Bradshaw v. Daniel*, 854 S.W.2d [865,] 870 [(Tenn. 1993)]; *Newton v. Tinsley*, 970 S.W.2d [490,] 492 [(Tenn. Ct. App. 1997)]. Simply stated, persons do not ordinarily have a duty to act to protect others from dangers or risks except for those that they themselves have created. *Biscan v. Brown*, 160 S.W.3d 462, 478-79 (Tenn. 2005); *Nichols v. Atnip*, 844 S.W.2d 655, 661 (Tenn. Ct. App. 1992).

> Tennessee's general rule with regard to nonfeasance is consistent with the Restatement's position that "[t]he fact . . . the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Restatement (Second) of Torts § 314, at 116. This general and long-standing principle of tort law [is] often termed either the "no duty to act rule" or the "no duty to rescue rule". . . .

*Id*. at 357.

However, in order to mitigate the harshness of the common law rule, our courts have recognized certain exceptions where "the defendant has a special relationship with either the individual who is the source of the danger or the person who is at risk," such as between a landlord and tenant. *Giggers*, 277 S.W.3d at 364. Thus, under Tennessee law, "'while an actor is always bound to prevent his acts from creating an unreasonable risk to others, he is under the affirmative duty to act to prevent another from sustaining harm only when certain socially recognized relations exist which constitute the basis for such legal duty.'" *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997) (quoting *Bradshaw*, 854 S.W.2d at 871).

In her deposition, Ms. Steele stated that a sheriff's deputy arrived at the office where she worked on September 29, 2008, and asked her if she was the office manager, to which she responded "yes." According to Ms. Steele, he handed her "papers for Dr. O'Connor," but she did not know what the papers were "until after [she] had them." She could not remember the officer explaining to her what the papers were, and the two did not discuss whether or not she was authorized to accept process on Dr. O'Connor's behalf. After he left, she handed the documents to Dr. Pearson.

The issue here is one of characterization. Plaintiffs argue that both Ms. Steele and Dr. Pearson had a duty to inform the sheriff's deputy who delivered the documents for Dr. O'Connor that they were not authorized to accept process on Dr. O'Connor's behalf—or at least to inquire about the nature of the delivered papers. Plaintiffs characterize this as a "duty to disclose" or a "duty not to interfere." Still, the crux of Plaintiffs' argument is that Defendants had a duty to take some action to correct the officer's error in serving process on one not authorized to accept it. There is, however, no special relationship recognized at law between Defendants and Plaintiffs that qualifies as an exception to the "no duty to act rule."

Plaintiffs make much out of the trial court's "fail[ure] to apply the balancing test outlined in *Satterfield* to determine whether or not Defendants[] had a duty." The Tennessee Supreme Court explained the balancing test Plaintiffs refer to as follows:

> When the existence of a particular duty is not a given or when the rules of the established precedents are not readily applicable, courts will turn to public policy for guidance. Doing so necessarily favors imposing a duty of reasonable care where a defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property. When conducting this analysis, the courts have considered, among other factors: (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct.

*Satterfield*, 266 S.W.3d at 365 (citations and internal quotation marks omitted). However, Plaintiffs erroneously characterize the alleged negligence of Ms. Steele and Dr. Pearson as misfeasance rather than nonfeasance. The balancing test above has generally been applied where a defendant's conduct poses an unreasonable and foreseeable risk of harm, not a defendant's inaction. *See Grogan v. Uggla*, 535 S.W.3d 864, 871-72 (Tenn. 2017) (declining to analyze the issue of duty under the "*Satterfield* duty factors" where a defendant inspect[or] failed to identify a source of harm during an inspection); *see also*, *e.g.*, *Burroughs v. Magee*, 118 S.W.3d 323, 329-35 (Tenn. 2003); *Satterfield*, 266 S.W.3d at 365-69.

*See also Satterfield*, 266 S.W.3d at 355 (explaining that rules with respect to "unreasonable risk" serve as "restraints upon a person's actions that create" such risk).

Similarly, here, Plaintiffs erroneously characterize Wolf's alleged failure to inspect or remove hazardous trees as misfeasance; however, what Plaintiffs have alleged is not "active misconduct working positive injury to others," but rather "passive inaction" on Wolf's part or Wolf's "failure to take steps to protect" Plaintiffs' insureds from harm. *See Satterfield*, 266 S.W.3d at 356. In essence, Plaintiffs have alleged nonfeasance, and Wolf therefore maintained no common law duty to act. *See id.*

Plaintiffs also argue that the ANSI A300 standards represented an "industry custom or practice" imposing a duty upon Wolf to inspect for hazardous trees that could impact the electrical lines. Plaintiffs urge that various witnesses testified via deposition that compliance with these standards was mandated by the Contract. We reiterate that although the ANSI A300 and other such standards were clearly applicable to pruning methods pursuant to the language of the Contract, this fact does not warrant imposition of an additional duty upon Wolf (to inspect for hazardous trees outside the right of way) for which Wolf did not bargain in the Contract. Likewise, the fact that Plaintiffs' expert, Mr. Neal, opined that the ANSI standards or other regulations would apply to Wolf's work as a VM contractor does not necessarily mean that Wolf could be charged with a duty to inspect trees located outside the right of way that Wolf had contractually agreed to maintain. We again note that "content meaning and application of . . . regulations are not a matter of fact to be proven by the affidavit of an expert witness, but are a matter of law." *Dempsey*, 755 S.W.2d at 806.

We accordingly conclude that Wolf owed no duty to Plaintiffs or their insureds in this matter by virtue of its contract with SCES, Tennessee common law, public policy, statute, or applicable regulations. We therefore affirm the trial court's grant of summary judgment in Wolf's favor based on a lack of duty.

Plaintiffs assert that the trial court improperly granted summary judgment as to their remaining claims of negligent trespass and nuisance. As to their claim of negligent trespass by fire, such claim is premised upon their allegation that Wolf negligently caused the property of Plaintiffs' insureds to be invaded by fire. In their brief, Plaintiffs cite Section 165 of the Restatement (Second) of Torts, which states:

> One who <u>recklessly</u> or <u>negligently</u>, or <u>as a result of an abnormally dangerous activity</u>, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest.

(Emphasis added.)

As the trial court properly reasoned, Plaintiffs have failed to demonstrate negligence on Wolf's part due to lack of duty. Plaintiffs have likewise failed to prove that Wolf acted recklessly or engaged in an abnormally dangerous activity. As such, Plaintiffs cannot rely on the above Restatement section as a basis for imposing liability on Wolf.

With respect to their remaining claim of nuisance, Plaintiffs argue that their claim of nuisance is not dependent upon a finding of negligence, asserting that "nuisance may exist either with or without negligence." *Roles-Walter v. Kidd*, No. M2017-01417-COA-R3-CV, 2018 WL 1920166, at *3 (Tenn. Ct. App. Apr. 24, 2018) (quoting *Weakley Cnty. v. W. L. Carney*, 14 Tenn. App. 688, 1932 WL 1295, *3-4 (Tenn. Ct. App. March 31, 1932)). As the *Roles-Walter* Court proceeded to explain:

> The distinction between "nuisance" and "negligence" has been stated as follows:
>
> When defendant is the creator of a dangerous situation, his liability therefor is for a nuisance; but when defendant did not create a dangerous situation but is nevertheless under a duty to remove the danger, failure to do so involves a question of negligence. Another statement of the distinction is that, where the damage is the necessary consequence of just what defendant is doing, or is incident to the business itself or the manner in which it is conducted, the law of negligence has no application and the law of nuisance applies. It has also been said that the distinction lies in the fact that the creation or maintenance of a nuisance is the violation of an absolute duty, the doing of an act which is wrongful in itself, whereas negligence is the

violation of a relative duty, the failure to use the degree of care required under the particular circumstances in connection with an act or omission which is not of itself wrongful.

*Roles-Walter*, 2018 WL 1920166, at *4.

Plaintiffs therefore appear to concede in their brief that Wolf can only be liable for nuisance if Plaintiffs were able to establish that Wolf's acts constituted misfeasance rather than nonfeasance—in other words, if Wolf were the creator of the dangerous condition. As the trial court correctly noted, inasmuch as Plaintiffs' misfeasance argument failed, so too would their nuisance claim. We agree and conclude that summary judgment was properly granted in Wolf's favor on Plaintiffs' remaining claims.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's grant of summary judgment in Wolf's favor concerning all of Plaintiffs' claims. We remand this matter to the trial court for further proceedings consistent with this Opinion and collection of costs assessed below. Costs on appeal are assessed to the appellants, Allstate Property & Casualty Insurance Company; Allstate Vehicle & Property Insurance Company; Allstate Indemnity Company; Allstate Fire & Casualty Insurance Company; Allstate Insurance Company; Allstate County Mutual Insurance Company; Cincinnati Insurance Company; Cincinnati Specialty Underwriters Insurance Group; Farmers Insurance Exchange; Foremost Insurance Company Grand Rapids, Michigan; Garrison Property and Casualty Company; General Insurance Company of America; Homesite Insurance Company of the Midwest; LM Insurance Corporation; Lexington Insurance Company, Liberty Mutual Fire Insurance Co.; Metropolitan Property & Casualty Company; Safeco Insurance Company of America; State Farm Fire & Casualty Company; State Farm Mutual Automobile Insurance Company; United National Insurance Company; United Services Automobile Association; USAA Casualty Insurance Company; and USAA General Indemnity Company.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE

- 32 -